# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

BELLSOUTH
TELECOMMUNICATIONS, INC.,

     Plaintiff,

                                                   CIVIL ACTION NO.

v.                                                  00-0093-RV-S

CITY OF MOBILE,

     Defendant.

## ORDER

This matter is before the Court on the defendant City of Mobile's ("the City") Motion for Summary Judgment (Doc. 53), the plaintiff BellSouth Telecommunications, Inc.'s ("BellSouth") brief in opposition[1] thereto (Doc. 65), and the defendant's reply (Doc. 69).[2]

BellSouth has brought this action challenging the City's enforcement of its "Rights of Way Construction and Administration Ordinance," City Ordinance No.

---

[1] The court notes that plaintiff's response though it is not titled as such, also requests that summary judgment be granted in its favor.

[2] The defendant also has a motion to dismiss (Doc. 40) pending before this court. For the reasons put forth below, that motion is denied as moot.

57-022, on the grounds that the Ordinance is preempted by state and federal law and also violates equal protection, due process, and the commerce clause of the United States Constitution. BellSouth initially sought a preliminary injunction prohibiting the City from enforcing this ordinance, but its motion for injunctive relief was denied by this court on March 13, 2000 (Doc. 22).

## I. FACTUAL BACKGROUND

BellSouth is a Georgia corporation that provides telecommunications services throughout the southeastern United States. Since 1879, when it was originally incorporated as the Southern Bell Telephone and Telegraph Company, BellSouth has held a statewide franchise from the State of Alabama that authorizes it to build and operate telecommunications facilities along the public rights of way (i.e., the public streets and highways).[3] Pursuant to this franchise, BellSouth has built an extensive network of telephone lines and related facilities to provide telecommunications services to individuals, businesses, and governmental entities in the State of Alabama, including the City of Mobile.

---

[3] "The right of way is granted to any person having the right to construct telegraph lines within this state, upon the margin of any highway." Ala. Code § 1670 (1876). See also Ala. Code § 23-1-85 (1975) ("The right-of-way is granted to any person or corporation having the right to construct electric transmission, telegraph or telephone lines within this state to construct them along the margin of the right-of-way of public highways.").

On March 30, 1999, the Mobile City Council adopted Ordinance 57-022, which is entitled "Mobile Rights of Way Construction and Administration Ordinance." Prior to the enactment of this ordinance, BellSouth was able to write its own permits to perform repair, construction, or maintenance within the City's rights-of-way, absent any prior authorization from the City. Under the Ordinance, any party who seeks to perform excavation or construction work on public streets or rights-of-way must now first obtain a permit from the City Engineer. In order to obtain such a permit, the party must submit a permit application, pay a permit fee, and file detailed plans with the City Engineer before beginning the project.

The Ordinance does not require each permit application to be submitted individually. Rather, the Ordinance contains a "bundled permit" or "bulk permit" provision that allows for advance permitting on an annual, semi-annual, or quarterly basis for routine minor projects outside the roadway limits and small projects that involve minimal excavations. The vast majority of BellSouth's projects are "minor projects" that would not be affected by the Ordinance. Furthermore, the Ordinance contains an "emergency project" provision which would allow BellSouth to conduct emergency construction or excavation without first obtaining a permit from the City Engineer.

The court finds that the permit fees are directly related to the use of Mobile's rights-of-way. The fees, which are based upon the size or duration of the project, are calculated to compensate the City for the costs of administering and enforcing the Ordinance. In fact, the Ordinance stipulates that:

> The permit fees imposed by Section 4 of the Ordinance are adopted pursuant to the City's police power. The purpose of the permit fees is to enable the City to recover its costs of administration and enforcement and not for the purpose of raising revenue.

(Mobile Ordinance section 1.2.7). Although the City's municipal agencies are not required to pay permit fees to the City itself, city projects are not exempt from the construction standards or any other requirements established by the Ordinance.

The plans that must be submitted to the City Engineer are certain engineering drawings relating to the manner in which the permit applicant intends to comply with applicable traffic control, safety, landscaping, and erosion control ordinances and requirements. A party performing a "major" project, as that term is defined by the Ordinance, must also satisfy certain notice requirements before the project may begin.

Section 37-1-31 of the Alabama Public Utilities and Public Transportation Act gives the Alabama Public Service Commission ("PSC") the exclusive authority over the "rates and service regulations and equipment" of public utilities

and transportation. However, the PSC does not inspect excavation work done by or on behalf of BellSouth on or in the streets and public rights-of-way of the City of Mobile. (See Stipulation of the Parties, filed November 2, 2000).

Additionally, the PSC has no rules, regulations, or other requirements pertaining to and does not inspect the manner in which BellSouth or any of its construction contractors do any of the following:

    (a).    Repair or re-pave cuts made in the asphalt of the City's streets;

    (b).    Repair, fix, backfill, or re-concrete sidewalks in the City;

    (c).    Repair, fix, or backfill trenches or pits dug on or in the City's rights-of-way;

    (d).    Control erosion or sediment run-off while doing excavation or utility work on or in the streets and public rights-of-way of the City;

    (e).    Manage or otherwise provide for traffic control at and around the sites of excavation or utility work on or in the streets and public rights-of-way of the City;

    (f).    Comply with the provisions of the Manual on Uniform Traffic Control Devices while doing excavation or utility work on or in the streets and public rights-of-way of the City;

    (g).    Comply with the Mobile Tree Landscaping and Protection Ordinance while doing excavation or utility work on or in the streets and public rights-of-way of the City;

    (h).    Provide for the safety and protect the general public from injury by using barricades, signs, lights, fencing, or other barriers while doing excavation or utility work on or in the streets and public rights-of-way of the City.

(See id.).

In fact, the PSC has no rules, regulations, or other requirements similar to the City of Mobile's "Construction Standards for Miscellaneous Construction,

Utility Excavation, and Right of Way and Pavement Restoration." (See id.). For example, the PSC has no rules, regulations, or other requirements that establish or provide specifications or details for:

> (a) the use, selection, installation, testing, and compaction of backfill material that is used for backfilling excavated areas of the City's streets, roads, or rights-of-way.
> (b) construction procedures and materials utilized in the restoration of the City's paved streets and roadways, concrete sidewalks, curbs, and gutters, or unpaved areas of the City's rights of way.
> (c) the manner in which a utility company repairs or replaces asphalt or concrete portions of the City's streets, roads, sidewalks, and rights of way.

(See id.)

Additionally, the PSC has no rules, regulations, or other requirements applicable to BellSouth or any of its construction contractors that:

> (a) establish or provide specifications or details for traffic control and safety in and around construction operations.
> (b) establish or provide specifications or details for the manner in which any streets, roads, or rights-of-way within the City may be excavated and the manner in which any such excavation will be repaired.
> (c) establish or provide specifications or details for the materials used in the repair or patching of trench or roadway excavations on the streets, roads, sidewalks, and rights of way of the City.
> (d) prohibit or restrict the City from implementing and enforcing pre-construction permitting requirements that require submittal of construction plans and drawings, an erosion control plan, a safety plan, a traffic control plan, and a landscape plan.
> (e) prohibit or restrict the City from charging a permit fee for utility construction work conducted in or on the City's rights of way.

(See id.)

Finally, Mobile's Ordinance does not prohibit or have the effect of prohibiting the ability of BellSouth to provide interstate or intrastate telecommunications service. (See Depositions of Charles H. Sharpe at 14-16; E. Carl Robitzsch at 238-245; BellSouth Project Manager Jack Strunk at 32; BellSouth Project Manager Dianna Haynes at 16; BellSouth Construction Area Manager Willie Washington at 35-44; deposition of BellSouth Network Manager Brenda Tucker at 63-64).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a summary judgment motion, the court must view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See Alexander v. Fulton County, 207 F.3d 1303, 1335 (11th Cir. 2000). The party seeking summary judgment has the initial burden of showing that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Once the moving party meets that burden, the non-moving party must set forth specific facts which demonstrate that there is a genuine issue of material

fact for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 585-86 (1986).  A genuine issue of material fact exists for trial if a reasonable

jury could return a verdict in favor of the non-moving party.  See Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

To avoid an adverse ruling on a motion for summary judgment, the non-

moving party "may not rest upon the mere allegations or denials of [its] pleading."

Fed R. Civ. P. 56(e).  Nor may the non-moving party defeat summary judgment by

providing a mere "scintilla" of evidence.  See Burger King Corp. v. Weaver, 169

F.3d 1310, 1321 (11th Cir. 1999).  Instead, there must be a genuine factual conflict

in the evidence to support a jury question.  See Continental Cas. Co. v. Wendt, 205

F.3d 1258, 1261 (11th Cir. 2000).

## III. DISCUSSION

### A. Federal Preemption[4]

BellSouth contends that Ordinance 57-022 conflicts with the Federal

Telecommunications Act of 1996 ("FTA"), specifically 47 U.S.C. § 253(a), and

that the Ordinance is therefore preempted by federal law.

---

[4]As the defendant notes, BellSouth asserts both a claim of "federal preemption"
and a claim under the "supremacy clause."  These claims are essentially the same and
do not require separate analysis.

Preemption is a question of congressional intent which requires the court to examine "the text and structure of the statute at issue." CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 664 (1993). Preemption is therefore also an issue decided as a matter of law. See Teper v. Miller, 82 F.3d 989, 993 (11th Cir. 1996). Whether the FTA preempts Mobile's Ordinance[5] is "a question of congressional intent," Irving v. Mazda Motor Corp., 136 F.3d 764, 767 (11th Cir. 1998)(citation omitted), that requires interpretation and application of the statute. CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 664 (1993) ("Evidence of preemptive purpose is sought in the text and structure of the statute at issue."). The Eleventh Circuit has held that this "raises an issue of law." See Teper, 82 F.3d at 993 (citation omitted). Indeed, this Circuit has recently observed that interpretation of a statute begins with the language of the statute itself, and if the language of the statute is plain then the "interpretative function ceases" and the courts should enforce the statute according to its terms. Griffith v. United States, 206 F.3d 1389 (11th Cir. 2000).

Section 253 provides in relevant part:

(a)    IN GENERAL -- No State or local statute or regulation, or

---

[5]The court notes that for purposes of preemption analysis, the constitutionality of local ordinances "is analyzed the same way as that of statewide laws." Wisconsin Public Intervenor v. Mortimer, 501 U.S. 597, 605 (1991).

other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b)    STATE REGULATORY AUTHORITY -- Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications service and safeguard the rights of consumers.

(c)    STATE AND LOCAL GOVERNMENT AUTHORITY -- <u>Nothing in this section affects the authority of a State or local government to manage the public rights-of-way</u> or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253 (emphasis added). While this section preempts a state or local government's regulation of telecommunications in general, it specifically excludes from preemption a state's authority to protect the public safety and welfare and the authority of a local government to manage its public rights-of-way.

State and local regulations established under the traditional police powers of the states are not superseded by federal law unless such preemption was the "clear and manifest purpose of Congress." <u>National Solid Wastes Mgmt. Ass'n v.</u>

Alabama Dep't of Envtl. Mgmt., 910 F.2d 713, 723 (11th Cir. 1990). In

Wisconsin Public Intervenor, the United States Supreme Court said:

> When considering pre-emption, "we start with the assumption
> that the historic police powers of the States were not to be
> superseded by the Federal Act unless that was the clear and
> manifest purpose of Congress."

Id. at 605; see also CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 664

(1993) ("In the interest of avoiding unintended encroachment on the authority of

the States, however, a court interpreting a federal statute pertaining to a subject

traditionally governed by state law will be reluctant to find preemption. Thus,

preemption will not lie unless it is 'the clear and manifest purpose of Congress.'").

No such congressional purpose however exists to preempt the ability of state and

local governments to manage their public rights-of-way, and no preemptive

purpose or intent can be gleaned from either the statute or its legislative history.

The 1996 Act clearly states that "[n]othing in this section affects the authority of a

State or local government to manage the public rights-of-way." 47 U.S.C. §

253(c) (emphasis added). The language which has been chosen by Congress is a

clear indication of Congressional intent with respect to what was intended by that

section, and there is no need to look any further than this clear expression of its

purpose.[6]

The intent of section 253(c) was to leave undisturbed the traditional local

authority to "manage the public rights-of-way." <u>AT&T Communications of the</u>

<u>Southwest, Inc. v. City of Dallas</u>, 8 F. Supp. 2d 582, 591 (N.D. Tex. 1998).  The

report of the House of Representatives makes this undoubtedly clear:

> [Section 253(c)] makes explicit a local governments
> continuing authority to issue construction permits
> regulating how and when construction is conducted on
> roads and other public rights-of-way.  This provision
> clarifies that local control over construction on public
> rights-of-way is not disturbed.

House Report 104-204, reprinted in U.S. Cong. & Ad. News, March 1996,

Volume 1, Legislative History section at 41.  In fact, when called upon to interpret

this section, the Federal Communications Commission ("FCC") concluded:

> We recognize that section 253(c) preserves the authority
> of state and local governments to manage public rights-of-way.
> Local governments must be allowed to perform the range of
> vital tasks necessary to preserve the physical integrity of streets
> and highways, to control the orderly flow of vehicles and
> pedestrians, to manage gas, water, cable (both electric and cable
> television), and telephone facilities that crisscross the streets
> and public rights-of-way.  We have previously described the
> types of activities that fall within the sphere of appropriate

---

[6] In fact, to this point, BellSouth has never put forth any contrary Congressional
purpose for including section 253(c) in the text of the act.

rights-of-way management in both the Classic Telephone Decision and the OVS Orders, and that analysis of what constitutes appropriate rights-of-way management continues to set the parameters of local authority. These matters include coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of the various systems using the rights-of-way to prevent interference between them.

In re TCI Cablevision of Oakland County, Inc., FCC File No. CSR-4790, FCC 97-331, 12 F.C.C.R. 21396 at ¶ 103, 1997 WL 580831 (F.C.C., adopted September 18, 1997).[7]

Since BellSouth cannot ignore the existence and effect of section 253(c), it contends instead that the Mobile Ordinance exceeds the authority that was preserved to it under that section. In making this argument, BellSouth relies on several other FTA preemption cases, each of which is distinguishable from this one.[8]

---

[7]The FCC's interpretation and construction of the statute are entitled to judicial deference. See CBS, Inc. v. FCC, 453 U.S. 367, 390 (1981).

[8]The obvious difference between the cases relied upon by BellSouth and this one is that those cases involve various requirements imposed upon telecommunications providers in order for them to receive franchises allowing them to conduct business within that city. The Mobile Ordinance involves only the granting of permits for those seeking to do construction, excavation, maintenance, and repair upon the City's rights-of-way. In no other way does it restrict telecommunications companies from providing service to its customers.

BellSouth first points to the "watershed case" of <u>AT&T Communications v.</u> <u>City of Dallas</u>, 8 F. Supp. 2d 562 (N.D. Tex. 1998) ("<u>Dallas I</u>"), wherein the court enjoined the enforcement of a city ordinance that imposed various requirements upon telecommunications companies in order for them to receive city franchises allowing them to do business in the city. See <u>id.</u> That court concluded that section 253 "limits the scope of [a municipality's] authority to regulate telecommunications in two narrow areas: the 'management' of city rights-of-way, and the requirement of fees for the use of rights-of-way." <u>Id.</u>; see also 47 U.S.C. § 253(c). The court then went on to state that while the FTA allows a city to require a company to obtain a franchise, it does not "grant a city the authority to place conditions on a franchise for telecommunications services, other than those related to the use of rights-of-ways." <u>Dallas I</u>, 8 F. Supp. 2d at 593. In making its decision, the court found that many of the restrictions and requirements of the ordinance were "totally unrelated to use of the city's rights-of-way, and are thus beyond the city's authority." <u>Id.</u>[9] In addition, the court found that the city did not

_____

[9]For example, in order to obtain a franchise allowing it to provide additional services to its customers (which did not entail any construction or modification of the existing facilities which were governed by the ordinance), the <u>Dallas I</u> ordinance required, AT&T to *inter alia*: (1) submit and "extensive and burdensome" franchise application; provide prior notification of all services offered in the city; (2) refuse to provide any services or facilities for resale to any person or company that does not also have a city ordinance; (3) provide ubiquitous services throughout the City; (4)

have the authority to impose a fee on a telecommunications provider "except as compensation for use of the City's rights-of-way." See id. at 593. While the court's opinion in Dallas I is instructive, the facts of that case differ greatly from those presently before this court. The Mobile Ordinance does not place any restrictions or impose any requirements upon a utility company seeking to do business in Mobile other than those relating to its use of the City's rights-of-way. Furthermore, the fees imposed by the Mobile Ordinance are reasonable and are a direct compensation to the City for the actual use of its right-of-way.

Plaintiff also cites AT&T Communications of the Southwest, Inc. v. City of Austin, 975 F. Supp. 928 (W.D. Tex 1997), in support of its position. In that case, the court enjoined the city from enforcing an "extremely comprehensive"[10]

---

be capable of providing service to end users within six months of the issuance of the franchise; (5) permit the city to use, without charge, one duct or subduct of each and every AT&T conduit in the city; (6) dedicate a single dark fiber pair throughout the portion of the telecommunications system owned by AT&T to the exclusive use of the City; (7) permit potentially detailed audits of AT&T's financial and other records; and (8) notify the City of all communications with the FCC, the SEC, and the Texas Public Utilities Commission that relate to services in Dallas. In addition, AT&T was required to pay the city a franchise fee equal to four percent of its gross receipts for all of its operations in the city. See id. at 587.

[10]The ordinance required:
(1) a non-refundable $850.00 application fee; (2) quarterly franchise fees to compensate the City for use and occupancy of the public rights-of-way; (3) disclosure of detailed financial and organizational materials, including copies of the company's filings with the Securities and Exchange Commission, its latest annual report and

ordinance that effectively prevented AT&T's entry as a local telephone service provider in Austin, Texas. Id. at 934-35. The service which AT&T sought to provide entailed the purchasing of local telecommunications service from an existing local provider, and reselling them, allowing them to use existing facilities, and thus did not require any "install[ation], operat[ion], maint[enance], or repair [of] any facilities in the City's public rights-of-way." Id. The court found that the City's assertion that this "non-facilities-based provider" would still be "using" the City's rights-of-way to be "wholly unpersuasive," and characterized the City's definition of "use" as a "metaphysical interpretation" that "defies logic and common sense." Id. at 943. The Mobile Ordinance, in contrast, is much less restrictive and only pertains to a utility provider's actual use of a public right-of-

---

prospectus, and its Articles of Incorporation and Bylaws; (4) information relating to state and federal certificates of authority to operate as a telecommunications service provider, as well as franchises held in other Texas municipalities; (5) continuing disclosure requirements, such as providing updated audits of its business records and notifying the City of all petitions, applications, and communications with the FCC and the Public Utility Commission affecting the use of public rights-of-way; (6) information regarding any legal or administrative proceedings in which the provider may have been involved; and (7) information relating to the company's Equal Employment Opportunity program, as well as company plans to encourage procurements from minority-and women-owned businesses. The Ordinance also grants the City the authority to conduct audits of the corporation on thirty-days notice. In addition, the approval process could take up to six months, and operation absent such consent could result in criminal penalties and fines. Id. at 934-35.

way. Therefore, the court's holding in <u>Austin</u> provides little support for BellSouth's claims.

BellSouth also relies upon the opinion in <u>Peco Energy Corp. v. Township of Haverford</u>, No. 99-4766, 1999 WL 1240941 (E.D. Pa., Dec. 20, 1999). In finding that the ordinance in question exceeded the scope of section 253(c), the court explained that it gave the Township Manager "total discretion in deciding whether to grant or deny a franchise, without providing any guidelines for how that decision should be made. Also, the Ordinance fails to disclose the required compensation and fees, or even the basis for calculating and imposing those fees." <u>Id.</u> at *6. Neither of those conditions exist in the Mobile Ordinance. The discretion of the City Engineer is guided by specific considerations which all relate directly to the management of the City's rights-of-way. Furthermore, the fees imposed are set out with specificity and are based upon actual construction upon and obstruction of the public rights-of-way by utility companies, rather than any speculative percentage from the gross revenues of those companies. As stated above, the Mobile Ordinance involves only the granting of permits for utility providers to perform construction upon the City's rights-of-ways, rather than city franchises allowing them to do business generally.

Finally, BellSouth cites Bell Atlantic Maryland, Inc. v. Prince George's County, 49 F. Supp. 2d 805 (D. Md. 1999), which has been vacated by the Court of Appeals of the Fourth Circuit.[11] The Bell Atlantic case is also distinguishable in that it involved a municipal ordinance that "vest[ed] the County with complete discretion to grant or deny a franchise application based on a wide-ranging set of factors that include the applicant's 'managerial, technical, financial, and legal qualifications to construct and operate a telecommunications system on County property' and '[w]hether the proposal will serve and protect the public interest." Id. at 817. The Prince George ordinance also imposed a three percent "right-of-way charge" on a franchisee's annual gross revenues which the court found was not "directly related to Bell Atlantic's actual physical use of the County's rights-of-way," as it was based upon the franchisee's profitability rather than any actual "degree of use" of the public rights-of-way. Id. at 818. The Mobile Ordinance, in contrast, does not contain any such provisions, and is directly related to the actual use of the City's rights-of-way.

The construction, maintenance, and permitting requirements set forth in Mobile's Ordinance serve to provide Mobile with the means "necessary to

---

[11]Bell Atlantic Maryland, Inc. v. Prince George's County, 212 F.3d 863 (4th Cir. 2000).

preserve the physical integrity of [its] streets and highways," See In re TCI, 1997 WL 580831, as is expressly permitted by section 253(c). The plain and unambiguous language of section 253(c) and its legislative history demonstrate that it was the clear purpose of Congress to leave undisturbed a local government's traditional authority over construction on roads and other public rights-of-way. Nothing in the Mobile Ordinance exceeds the reservation of authority contained in section 253(c). See 47 U.S.C. § 253(c). The compensation imposed by the Ordinance is reasonable and is directly related to the actual use of the City's rights-of-way. See id. These fees are publicly disclosed and are administered in a competitively neutral and nondiscriminatory basis. See id. Accordingly, The court finds that Mobile's Rights of Way Construction and Administration Ordinance 57-022 is not preempted by the FTA.

## B. State Preemption

BellSouth also contends that the Mobile Ordinance is preempted by state law, in that it allows the City to intrude upon the authority which the state has exclusively vested in the Alabama Public Service Commission ("PSC") over telecommunications through Alabama Code section 37-1-31.

The State of Alabama has delegated exclusive jurisdiction "in respect of rates and service regulations and equipment" to the PSC. Ala. Code § 37-1-31. Section 37-1-35 of the Alabama Code, however, provides that:

**Nothing in this title is intended or shall be construed**:

(1) To limit or restrict the police jurisdiction or power of municipalities over their streets and other highways and public places or the power to maintain or the power to require maintenance of the same;

(2) To limit or restrict any right or power, by contract or otherwise, of any municipality to require utilities to pave and maintain the portions of highways used and occupied by them;

(3) In respect of matters other than rates and service regulations and equipment, over which exclusive jurisdiction is conferred by this title upon the commission to affect existing rights and powers or rights and powers hereafter acquired by municipalities under valid contracts with utilities;

(4) In respect of matters other than rates and service regulations and equipment, to repeal any power of any municipality to adopt and enforce reasonable police regulations and ordinances in the interest of the public safety, morals and convenience, or to protect the public against fraud, imposition or oppression by utilities within their respective jurisdiction, or to require the discharge by utilities of their respective duties within such municipalities, whether arising out of contract with municipality or by statute or regulation by the commission or otherwise.

Ala. Code § 37-1-35 (emphasis added). This section, like section 253(c) of the FTA, preserves a municipality's authority, in the exercise of its police powers, to

20

enact reasonable regulations related to the use and maintenance of the streets and rights-of-way. Section 11-45-1 of the Alabama Code authorizes municipalities to adopt ordinances in furtherance of their police powers. It provides:

> Municipal corporations may from time to time adopt ordinances and resolutions not inconsistent with the laws of the state to carry into effect or discharge the powers and duties conferred by the applicable provisions of this title and any other applicable provisions of law and to provide for the safety, preserve the health, promote the prosperity and improve the morals, order, comfort and convenience of the inhabitants of the municipality, and may enforce obedience to such ordinances.

Ala. Code § 11-45-1.

Mobile's Ordinance is a valid exercise of the City's police powers, and BellSouth has not demonstrated that the Ordinance is inconsistent in with the laws of the state. Significantly, BellSouth has not identified a single provision of Alabama law that contradicts the language of section 37-1-35.

The PSC does not control or regulate in any way the manner in which utility companies like BellSouth use and maintain the rights-of-way of local municipalities, and the PSC has no control over the exercise of police powers by local municipalities. See Birmingham Electric Co. v. Allen, 217 Ala. 607, 117 So. 199, 202 (1928) ("Properly construed . . . the city authorities acted in the exercise of legislative discretion, over which the Public Service Commission has no

control."). It is uncontroverted that the PSC does not inspect the repair and resurfacing work done by utilities to make sure that the work is done correctly or according to any acceptable standards or specifications. In fact, Alabama law gives the City plenary authority to "control and regulate the use of streets for any and all purposes." Ala. Code § 11-43-62. This section specifically authorizes municipalities to:

> regulate the use of streets for the erection of telegraph, telephone, electric and all other systems of wires and conduits and may require the same to be placed underground if deemed necessary for the public convenience and safety and generally to control and regulate the use of the streets for any and all purposes.

Id. As the Alabama Supreme Court has noted, "[t]he control of the public streets in conserving the public safety and convenience was deemed an essential sovereign power in the local authorities, who alone can keep an eye on conditions, and meet the needs as they arise." Birmingham Interurban Taxicab Service Corp. v. McLendon, 210 Ala. 525, 527, 98 So. 578 (1923).

Additionally, the factual record in this case is undisputed in that the Alabama Public Service Commission has not entered the field to regulate utility construction or usage of local rights-of-way and that the PSC does nothing that could be construed as a preemption of the City's authority to control and regulate

the use of its streets and rights-of-way. (See "Stipulation of the Parties" (Doc. 47)).

Mobile's Ordinance does not attempt to regulate the rates and service of any telecommunications provider or other utility that may come under the jurisdiction of the PSC, and the Ordinance does not infringe upon any regulatory activities that are within the exclusive control of the PSC. As the Stipulation of the Parties demonstrates, the PSC is not concerned with, and does not get involved with in any way, the issues and activities addressed by Mobile's Ordinance.

The court finds that the Mobile Ordinance is not preempted by state law or the PSC's exclusive jurisdiction "in respect of rates and service regulations and equipment." Mobile's Ordinance does what is expressly permitted by the Alabama Code.

## C. The"Illegalities of the Mobile Ordinance"[12]

### 1. The Supremacy Clause[13]

BellSouth maintains that the Mobile Ordinance is violative of the Supremacy Clause of the United States Constitution, Art. VI, § 2. As the Supreme Court has explained, federal law generally preempts state law under the Supremacy Clause whenever (1) Congress has expressly preempted state action, (2) Congress has installed a sufficiently comprehensive regulatory scheme in the area, thus removing the entire field from state realm, or (3) state action would directly conflict with the force or purpose of federal law. Lady v. Neal Glaser Marine, Inc., 228 F.3d 598, 601 (5th Cir. 2000) (citations omitted). The court having already found that the Mobile Ordinance does not run afoul of section

---

[12]In its First Amended Complaint, in addition to alleging violations of due process, equal protection, and the contract clause of the United States Constitution, BellSouth also claimed violations of the corresponding sections of the Alabama State Constitution. However, neither party has briefed much less discussed those State Constitutional claims, and they were not included in the Joint Pretrial Order submitted by the parties. Therefore, those claims are deemed waived by the plaintiffs. See Morro v. City of Birmingham, 117 F.3d 508 (11th Cir. 1997); Fed. R. Civ. P. 16(e).

[13]In its case, BellSouth has put forth a variety of different legal theories as to why the Mobile Ordinance is invalid. The court notes that there is substantial overlap between many of these claims, yet for the purposes of clarity and ease of administration, the court shall address each claim as it was put forth by BellSouth in its amended complaint and summary judgment response.

253(c) of the FTA, finds that BellSouth's Supremacy Clause argument is without merit.

## 2. Unlawful Impairment of Existing Contracts and Obligations.

BellSouth argues that the Mobile's Ordinance prevents or impairs its existing statewide franchise from the State of Alabama that authorizes it to build and operate telecommunications facilities along the public rights-of-way.  It has already been determined that BellSouth's exercise of the rights conferred to it by section 23-1-85 of the Alabama Code and the franchise agreements that were awarded in 1889 and 1901 to Southern Bell Telephone & Telegraph Company are subject to the City's authority to regulate and control the use of its streets.  See Southern Bell Telephone & Telegraph Co. v. City of Mobile, 162 F. 523, 533 (S.D. Ala. 1907) (holding that the telephone company's "rights . . . are subject to the reasonable regulations of the city municipality by virtue of its police power."); City of Mobile v. Southern Bell Telephone & Telegraph Co., 174 F. 1020 (5th Cir. 1909) (modifying the district court's decree to read that the city is not restrained or enjoined "from exercising such control of the use of said property by complainant as is consistent with the proper exercise of the police power."); see also BellSouth Telecomm., Inc. v. Town of Palm Beach, No.  98-8232-CIV, 1999 WL 33229296, at *6 (S.D. Fla., Sept. 28, 1999).

Furthermore, the telephone company itself recognized the city's authority over the streets and public ways in the 1901 franchise ordinance that specifically provides that the telephone company shall at all times be subject to city ordinances "relative to the use of public streets by telephone and telegraph companies." (1901 Ordinance at 2, § 6). In a case similar to this one, the court found "that municipalities may monitor and permit construction in local streets and receive minimal compensation for that disruption does not impose any impairment of contract on BellSouth that violates the state or federal Constitutions." Town of Palm Beach, 1999 WL 33229296, at *6 (S.D. Fla., Sept. 28, 1999). Likewise, the court finds that the Mobile Ordinance does not impose an impairment of BellSouth's contractual or property rights from its state franchise.

### 3. Due Process/Equal Protection.

BellSouth sets forth several theories as to why the ordinance violates its due process and the equal protection rights under the Fifth and Fourteenth Amendments of the United States Constitution.

### a. Arbitrary and Capricious

BellSouth first charges that its substantive due process and equal protection rights are being violated because:

The Mobile Ordinance does not achieve its stated objective of providing for the health, safety, and well being of its citizens and insuring the structural integrity of its streets. The means employed in the Mobile Ordinance are not substantially related to the stated objectives, and are both arbitrary and capricious both in design and intended application.

(First Amended Complaint at 7, ¶ 18(d)).[14]

The equal protection clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, S 1. The clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). Because the Ordinance does not target a protected class[15] or infringe upon fundamental constitutional rights, the substantive due process and equal protection claims both turn on the rational basis test. See Bannum, Inc. v. City of Fort Lauderdale, 157 F.3d 819, 822 (11th Cir. 1998); Georgia Manufactured Housing Association, Inc. v. Spalding County, 148 F.3d 1304, 1307 (11th Cir. 1998).[16] On rational basis

_____

[14]Much of BellSouth's complaint is pleaded in somewhat conclusory terms, and often fails to identify the specific sections of the Ordinance that are alleged to violate BellSouth's federal and state constitutional rights.

[15]In fact, the ordinance pertains to "any person" seeking to obstruct or construct upon the City's rights-of-way.

[16]The Eleventh Circuit has recognized that "[a] regulation rationally related to a legitimate government purpose under equal protection will almost always meet the

review, the Ordinance comes to the court "bearing a strong presumption of validity," FCC v. Beach Communications, Inc., 508 U.S. 307, 314 (1993), and is due to be "upheld if it is rationally related to a legitimate state interest." Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Authority, 825 F.2d 367, 370 (11th Cir. 1987).

Under the rational basis review, the court's inquiry is twofold. The first step is to identify "a legitimate government purpose — a goal — which the enacting government body could have been pursuing." Georgia Manufactured Housing, 148 F.3d at 1307 (emphasis added). Second, the Court must ask "whether a rational basis exists for the enacting government body to believe that the legislation would further the hypothesized purpose." Id.[17] As long as the justification for the Ordinance is "at least debatable," there is no denial of the equal protection of the laws. Alamo Rent-A-Car, 825 F.2d at 372.

The first step of the rational basis test is easily satisfied. Section 253(c) of the Telecommunications Act preserves the traditional authority of state and local

---

rational basis test of due process." Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Authority, 906 F.2d 516, 523 (11th Cir. 1990).

[17] When applying the rational basis test, the Court must be mindful that "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." FCC v. Beach Communications, Inc., 508 U.S. at 313.

governments to "manage the public rights-of-way." The House Report recognized that section 253(c) "makes explicit a local government's continuing authority to issue construction permits regulating how and when construction is conducted on roads and other public rights-of-way."[18] The FCC has recognized that local governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of the streets and highways, and this includes the continuing authority to do just what the City of Mobile's Ordinance sets out to accomplish. See In re TCI Cablevision of Oakland County, Inc., 1997 WL 580831.

Applicable state law also recognizes that local governmental entities like the City of Mobile have the authority and responsibility to maintain and require maintenance of their streets and rights-of-way. See Ala. Code § 37-1-35; Ala. Code § 11-43-62; Birmingham Interurban Taxicab Service Corp. v. McLendon, 210 Ala. 525, 527, 98 So. 578 (1923).

This obvious statutory recognition of the continuing authority of local governments to manage their rights-of-way demonstrates that the City of Mobile

---

[18] House Report 104-204, reprinted in U.S. Cong. & Ad. News, March 1996, Volume 1, Legislative History section at 41.

was pursuing a legitimate governmental purpose when Ordinance 57-022 was enacted. See, e.g., Bannum, Inc. v. City of Fort Lauderdale, 157 F.3d at 823.

The second step of the rational basis test is likewise satisfied, because the construction and administration requirements of the Ordinance are sufficiently related to the City's legitimate interests. See id. The City's Ordinance provides the means necessary to preserve the physical integrity of the City's streets and rights-of-way, and this Court has already recognized that the Ordinance "is a reasonable regulation of Mobile's rights-of-way that is expressly permitted by section 253(c) of the 1996 Act." (Order of March 13, 2000 (Doc. 22) denying Plaintiff's Motion for Preliminary Injunction, at 6). The City's imposition of permitting requirements and construction standards designed to preserve the integrity of the City's rights-of-way are rationally related to the legitimate interests and responsibilities of the City, and do not violate the constitutional guarantee of due process or equal protection.

### b. Discretion of the City Engineer

BellSouth first claims that the Ordinance leaves the city engineer with

"unchecked discretion" to deny a permit application. That argument is due to be rejected[19] based on the reasoning of the Alabama Supreme Court in Bobo v. City of Florence, 260 Ala. 239, 242, 69 So.2d 463, 466 (1953). In Bobo, the Alabama Supreme Court considered a suit brought to enjoin violations of a city zoning ordinance. The affected building owner argued that the ordinance violated due process because the issuance of a required permit was "left to the caprice of the inspector and therefore due process is not observed." 260 Ala. at 242. The Court rejected this argument, holding:

> But that is not the nature of the ordinance. Section 123 of the ordinance requires a plan drawn to scale of the proposed alteration, accompanied with much specified information as to details "to ascertain whether the proposed . . . alteration is in conformance with this ordinance." It then requires the issuance of a permit if the proposal is in conformity with its provisions. If the inspector does not approve it, he shall state in writing on the application the cause of such disapproval. No fault, as here insisted on, exists in respect to the ordinance nor its application to the facts alleged.

Id. at 242. See also, Vandergriff v. City of Chattanooga, 44 F. Supp. 2d 927, 938 (E.D. Tenn. 1998) (upholding similar procedures with regard to a municipal storm water ordinance). BellSouth once again relies on Peco, yet the discretion vested in the City Engineer does not even approach what that court described as the

---

[19] The Court had previously rejected this argument in its Order of March 13, 2000 denying BellSouth's Motion for Preliminary Injunction. (See Doc. 22 at 5, n.4.)

"apparently limitless discretion of the Township Manager" to "completely prohibit the provision of telecommunications services." 1999 WL 1240941 at *6-8. While the City Engineer does have discretion to deny permit applications for right-of-way construction projects, that discretion is sufficiently guided by rights-of-way considerations, and does not completely prohibit a company from obtaining a franchise to provide telecommunications services within the city, as did the ordinances in the cases cited by BellSouth.

### c. City Department Exemption

BellSouth also argues that the Ordinance "exempts the Mobile Departments from compliance with the ordinance" is incorrect, and was rejected by this court following the hearing on BellSouth's motion for preliminary injunction. (See Order of March 13, 2000 (Doc. 22)) denying Plaintiff's Motion for Preliminary Injunction, at 3). Although Mobile's municipal departments are not required to pay a permit fee to the City, city projects are not exempt from the construction standards or any other requirements of the Ordinance. Id. The Ordinance clearly applies to "any person" seeking to obstruct or construct any of the City's rights-of-way, and does not in any way favor one entity over another.

### d. Vagueness.

BellSouth also claims that the Mobile Ordinance is unconstitutionally vague. The void-for-vagueness doctrine is rarely applied outside the First Amendment context. American Iron and Steel Institute v. Occupational Safety and Health Administration, 182 F.3d 1261, 1277 (11th Cir. 1999). In analyzing a vagueness claim, the court must first determine whether the Ordinance reaches a substantial amount of constitutionally protected conduct. Bama Tomato Co. v. United States Department of Agriculture, 112 F.3d 1542, 1546 (11th Cir. 1997). If the Ordinance does not reach constitutionally protected conduct, then it is not void for vagueness unless it is "impermissibly vague in all of its applications." Id.; See American Iron and Steel Institute v. Occupational Safety and Health Administration, 182 F.3d 1261, 1277 (11th Cir. 1999) (quoting Hoffman Estates v. Fipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982)); see also, Exxon Corp. v. Busbee, 644 F.2d 1030, 1033 (5th Cir. Unit B, 1981) (appropriate test is whether the law is "substantially incomprehensible") (cited with approval in American Iron & Steel Institute, 182 F.3d at 1277).

Mobile's Ordinance clearly applies to all companies conducting construction on the City's rights-of-way. The key words and phrases are adequately defined, and every requirement is spelled out in some detail. The

language of the ordinance is neither impermissibly vague in all its applications nor substantially incomprehensible. See American Iron and Steel, 182 F.3d at 1277. The Ordinance is not unconstitutionally vague, and BellSouth's vagueness claim is due to be rejected as a matter of law.

## e. Takings

BellSouth claims that the Mobile Ordinance deprives BellSouth of its property rights without providing just compensation in violation of the Fifth and Fourteenth Amendments. BellSouth's use of the City's rights-of-way is subject to the continuing authority of the City to manage its rights-of-way in the exercise of its police powers. See Southern Bell Telephone & Telegraph Co. v. City of Mobile, 162 F. at 533. The Ordinance does not in any manner oust BellSouth from its use of the rights-of-way. See, e.g., BellSouth Telecomm., Inc. v. City of Orangeburg, 522 S.E.2d 804 (S.C. 1999). The City's imposition of permitting requirements and construction standards is designed to preserve the integrity of the City's rights-of-way, and does not, as a matter of law, constitute a taking of BellSouth's property for public use without just compensation. The Ordinance relates to the use of the City's property, the public streets and rights-of-way, and not BellSouth's own private property. The City has "taken" nothing from BellSouth, and BellSouth's takings claim therefore fails as a matter of law.

### f. Police Power.

BellSouth also maintains that the Ordinance is unconstitutional because it exceeds the City's authority under its police powers to control the use of its streets. As stated earlier, section 253(c) of the Telecommunications Act preserves the City's traditional authority to "manage the public rights-of-way." The Ordinance does what the FCC has recognized as being the vital tasks necessary to preserve the physical integrity of the streets. In re TCI Cablevision, 12 F.C.C.R. 21396 at ¶ 103. The Telecommunications Act does not make adoption of the Ordinance beyond the scope of the City's authority and instead sanctions such local right-of-way regulation.

Nor does state law place the Ordinance outside of the City's authority. Section 11-45-1 of the Alabama Code gives Alabama cities the authority to adopt ordinances in furtherance of their police powers, and section 11-43-62 gives Alabama cities plenary authority to regulate the use of the streets for the erection of telephone wires and conduits and "generally to control and regulate the use of streets for any and all purposes." As stated earlier, section 37-1-35 says that the grant of jurisdiction to the PSC is not intended or shall be construed to limit or restrict the City's police power over its streets and public places or the City's power to maintain its streets or to require utilities to maintain them. This section

further preserves the City's power to require utilities to pave and maintain the portions of the highways that they use and occupy. Ala. Code § 37-1-35(2). Mobile's Ordinance, and its construction standards, do just what state law authorizes, as the Ordinance and the construction standards are directly related to the use and maintenance of the streets and public rights-of-way.

### g. Permit Fees

BellSouth further alleges that the City "is attempting to burden BellSouth with indirect costs as part of the permit fees." The permit fees are, however, directly related to the use of Mobile's rights-of-way. The fees, which are based upon the size or duration of the project, are calculated to compensate Mobile for the costs of administering and enforcing the Ordinance. In fact, the Ordinance specifically states that:

> The permit fees imposed by Section 4 of the Ordinance are adopted pursuant to the City's police power. The purpose of the permit fees is to enable the City to recover its costs of administration and enforcement and not for the purpose of raising revenue.

(Ordinance § 1.2.7).

The Supreme Court's decision in Evansville-Vanderburgh Airport refutes BellSouth's suggestion that any permit fees must be calculated to do no more than exactly offset the City's costs. As that Court held, only some "fair approximation"

is required to pass constitutional muster, and so long as the fees "are reasonable and fixed according to some uniform, fair and practical standard they constitute no burden on interstate commerce." 405 U.S. at 712-13, 716.[20] Mobile's Ordinance sets out in detail a schedule of the fees that are assessed (see Appendix A to Ordinance), and this schedule reflects the requisite "uniform, fair and practical standard."

### h. City Indemnification

In addition, BellSouth's claim that the Ordinance impermissibly requires BellSouth to indemnify and hold the City harmless is misplaced. The FCC has concluded that the authority to manage the public rights-of-way includes the ability to "require a company to indemnify the City against any claims of injury arising from the company's excavation." In re Classic Telephone, Inc., FCC File No. CCBPol 96-10, FCC 96-397, 11 F.C.C.R. 13082 at ¶ 39, 1996 WL 554531 (F.C.C., adopted Sept. 30, 1996). Furthermore, a reading of the Ordinance shows that BellSouth's claim is entirely misplaced, because the indemnification

---

[20] The rationale and holding of the Evansville-Vanderburgh Airport decision were applied by the Eleventh Circuit in Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Authority, 906 F.2d 516, 518-522 (11th Cir. 1990), to uphold a user fee against a commerce clause challenge.

section of the Ordinance plainly states that it does not require indemnification for the City's own negligence.[21]

### i. Delays in Service

BellSouth next argues that the Ordinance is unduly burdensome and will cause substantial delays in its delivery of service. BellSouth cites no authority in support of this argument, and cites no authority to support the notion that this somehow raises a federal question. BellSouth's attempt to cloak its internal business practices with constitutional protection is unavailing. See Nebbia v. New York, 291 U.S. 502, 527-28 (1934) ("The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases.").

---

[21]Section 7.2 of the Ordinance states:

By accepting a Permit, a Permittee is required, to indemnify, and hold the City whole and harmless from all costs, liabilities, and claims for damages of any kind arising out of the Construction, presence, installation, maintenance, repair or operation of its Facilities, or out of any activity undertaken in or near a Rights of Way, whether any act or omission complained of is authorized, allowed, or prohibited by a Rights of Way Permit. It further agrees that it will not bring, nor cause to be brought, any action, suit or other proceeding claiming damages, or seeking any other relief against the City for any claim nor for any award arising out of the presence, installation, maintenance or operation of its Facilities, or any activity undertaken in or near a Rights of Way, whether the act or omission complained of is authorized, allowed or prohibited by a Permit. The foregoing does not indemnify the City for its own negligence. (emphasis added)

The Ordinance allows for "emergency projects" which can be completed prior to submitting a permit. Furthermore, the Ordinance does not require each permit application to be submitted individually, and contains a "bundled permit" or "bulk permit" provision that allows for advance permitting on an annual, semi-annual, or quarterly basis for routine minor projects outside the roadway limits and small projects that involve minimal excavation.[22] (See Order of March 13, 2000 (Doc. 22) denying Plaintiff's Motion for Preliminary Injunction, at 3). As BellSouth's area manager admitted at the hearing on its motion for preliminary injunction, the vast majority of its projects are minor projects that would not be affected by the Ordinance.[23] (Id. at 6). The court finds that this claim is devoid of merit.

### j. Other Provisions of the Ordinance

There are several other provisions of the Mobile Ordinance which BellSouth specifically challenges in its response to the City's motion for summary

---

[22] The Ordinance also contains an "emergency project" provision which allows BellSouth to conduct emergency construction or excavation without first obtaining a permit from the city engineer.

[23] The testimony and argument submitted at the hearing on BellSouth's motion for preliminary injunction is properly considered in relation to the City's motion to dismiss since that testimony is part of the record in this case. See Fed. R. Civ. P. Rule 65(a)(2).

judgment. BellSouth has provided little, if any legal support for these claims, and thus, they are disposed of with little legal analysis.[24]

BellSouth argues that Section 6.1 of the Ordinance which provides that no right-of-way permit will be granted to any person who is delinquent in paying a debt owed to the city, "has the effect of prohibiting BellSouth's ability to provide services." BellSouth maintains that this provision "makes the ordinance a revenue collecting tool for all types of indebtedness made by the city against a right-of-way applicant." However, BellSouth offers no legal authority that indicates that such a provision is improper or that it in any way prohibits BellSouth from providing service to its customers.

BellSouth also maintains that sections 5.7.1 and 6.1.2(e) are also invalid. Section 5.7.1 states that "(a) Permittee shall comply with all requirements of local,

---

[24]In fact, as is the case with many of BellSouth's claims, it appears that it lacks standing to bring them before the court at this time. The constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent," not "conjectural" or "hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). To date, BellSouth can point to no examples of the extreme situations hypothesized by it in this case. In fact, BellSouth has long ago received a franchise from the City, and has never been prevented from providing telecommunications services to its customers.

State, and Federal laws, including a franchise duly adopted by the City Council."
Section 6.1.2(e) gives the City Engineer the discretion, in considering a permit
application, to consider, along with several other factors, "the degree of
compliance of the Applicant with the terms and conditions of its franchise, this
Ordinance, and other applicable ordinances and regulations." Again, BellSouth
fails to provide a legal basis for why these provisions are improper, and cannot
show that these sections have prevented BellSouth from providing service to its
customers.

BellSouth next claims that the portions of the Ordinance that require
permittees to hold a valid city franchise and comply with the terms of such
franchise agreements is also impermissible and prohibits telecommunications
providers from providing service in Mobile. However, BellSouth never denied
that it already holds franchise agreements with the city, and cannot provide any
evidence of it or any other party having been denied either a construction permit or
a franchise by the city. Furthermore, the Ordinance contains nothing pertaining to
the requirements or procedures for obtaining a franchise from the City of Mobile.
Should BellSouth somehow be refused a franchise from the city, any such injury
would result from that procedure, and not from this Ordinance.

Finally, BellSouth finds fault both with the section of the Ordinance that requires select backfill to be used in excavated areas and the section that requires a utility provider to provide a written notice to occupants of premises adjacent to project sites five days prior to the commencement of "major" construction projects except in cases of emergency. The court does not recognize how it could be found that these portions of the Ordinance are not within the City's authority to regulate and manage its rights-of-ways.

BellSouth's constitutional claims are mainly a reiteration of its claim that the Ordinance is preempted by section 253(c), and that claim is due to be dismissed for the reasons cited above. By enacting Ordinance 57-022, the City of Mobile has not deprived BellSouth of any rights, privileges, or immunities secured by the Constitution and laws of the United States. The issue here does not involve a municipality's withholding of consent to a franchise application — something that is not contemplated by the Ordinance — but rather BellSouth's challenge to construction standards and permitting requirements that are, on their face, explicitly permitted by section 253(c).

**4. Commerce Clause.**

According to BellSouth, "[a]ny regulation by Mobile of BellSouth's intrastate operations pursuant to the Mobile Ordinance adversely affect interstate

commerce in violation of the U.S. Constitution." (First Amended Complaint (Doc. 39) at 7, ¶ 18(g)).

Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce. White v. Massachusetts Council of Constr. Employers, Inc., 460 U.S. 204, 213 (1983) (holding that if the city acts as "directed by Congress then no dormant Commerce Clause issue is presented")(citing Southern Pacific Co. v. Arizona, 325 U.S. 761, 769 (1945)); see also Evansville-Vanderburgh Airport Authority v. Delta Airlines, Inc., 405 U.S. 707, 721 (1972) (holding that a charge designed to make the user of state provided facilities pay a reasonable fee for their construction and maintenance may be imposed on interstate and intrastate users alike without running afoul of the commerce clause, and specifically noting that Congress had authorized fees to be assessed); BellSouth Telecommunications, Inc. v. Town of Palm Beach, No. 98-8232-CIV, 1999 WL 33229296, at *6 (S.D. Fla., Sept. 28, 1999) (rejecting plaintiff's commerce clause argument because section 253(c) "specifically allows state or local government to manage the rights-of-way and require reasonable compensation from telecommunications providers.").

The direct authority found in section 253(c) evidences that Congress did not believe that the valid exercise of the authority of a State or local government to manage the public rights-of-way would impermissibly burden interstate commerce. See White, 460 U.S. at 213. Mobile's Ordinance does what Congress has authorized it to do in section 253(c).

Any other Commerce Clause arguments are likewise easily disposed of because the Ordinance does not impermissibly burden interstate commerce. The Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 127-28 (1978). Mobile's Ordinance applies equally to all users of the local rights-of-way, and it does not favor one form or use of commerce over another. See Georgia Manufactured Housing, 148 F.3d at 1308 (finding that "laws that impose the same burden on in-state and out-of-state business interest usually do not violate the Commerce Clause."). Furthermore, any burden on interstate commerce is incidental rather than deliberately imposed as no greater permit fees or other requirements are levied on interstate telecommunications services as distinguished from intrastate telecommunications. See Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Authority, 906 F.2d 516, 518 (11th Cir. 1990).

The commerce clause does not exist to protect a business's right to conduct business according to whatever rules it wants. See Nebbia v. New York, 291 U.S. 502, 527-28 (1934) ("The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases."); Valley Bank of Nevada v. Plus Systems, Inc., 914 F.2d 1186, 1192 (9th Cir. 1990). The claim that one's costs will increase as a result of the Ordinance's requirements is insufficient to evidence any impermissible burden on interstate commerce. See Georgia Manufactured Housing, 148 F.3d at 1308 (construction requirement that would increase costs for the industry and consumers of manufactured housing does not demonstrate impermissible burden on interstate commerce "because price increases generally do not violate the dormant Commerce Clause.").

Finally, the Supreme Court's decision in Evansville-Vanderburgh Airport, 405 U.S. 707, disposes of any argument by BellSouth that the permit fees assessed by the Ordinance impermissibly impairs interstate commerce in violation of the commerce clause. That decision makes it clear that "it is settled that a charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance may constitutionally be imposed on interstate and domestic users alike." Id. at 714. Quoting from an earlier case, the Supreme Court reiterated that:

> Where a State at its own expense furnishes special facilities
> for the use of those engaged in commerce, interstate as well
> as domestic, it may exact compensation therefor. The amount
> of the charges and the method of collection are primarily for
> determination by the State itself; and so long as they are
> reasonable and are fixed according to some uniform, fair,
> and practical standard they constitute no burden on
> interstate commerce.

Id. at 712-13.

Thus, the Mobile Ordinance does not discriminate against interstate commerce, and does not in any way violate the Commerce Clause.


## IV. CONCLUSION

In sum, BellSouth's suggestion that Mobile's Ordinance is "a barrier to entry" and that the Ordinance has "an adverse effect on one's continued participation in the market" is not a realistic interpretation of section 253 and is an argument that the Sixth Circuit recently dismissed as sophistry. TCG Detroit v. City of Dearborn, 206 F.3d 618 (6th Cir. 2000). The issue here is not the City of Mobile's withholding of consent to a franchise application as in the cases relied upon by BellSouth. In fact, as the City points out, BellSouth presently operates under two franchise agreements with the City that authorize the erection and maintenance of poles, wires, cables, and conduits over and under city streets. It is

almost inconceivable how a city could manage and regulate the use of its rights-of-way without imposing at least some burden and inconvenience on those seeking to do construction upon them. The FCC, and all of the courts that have considered similar management requirements and construction standards, have said that local governments can do what the City of Mobile has done for the management of its rights-of-way.

Nearly a year has passed since this court denied BellSouth's motion to enjoin enforcement of the ordinance, yet BellSouth has yet to identify a single instance or occasion where it was prohibited from providing telecommunications services to its customers in the City of Mobile by virtue of the implementation or adoption of the Ordinance. (See deposition testimony of BellSouth General Manager Charles H. Sharpe at 14-16; deposition testimony of E. Carl Robitzsch at 238-245; deposition testimony of BellSouth Project Manager Jack Strunk at 32; deposition testimony of BellSouth Project Manager Dianna Haynes at 16; deposition testimony of BellSouth Construction Area Manager Willie Washington at 35-44; deposition of BellSouth Network Manager Brenda Tucker at 63-64).

In sum, BellSouth cannot plausibly make a claim that the Ordinance prohibits or has the effect of prohibiting the ability of BellSouth to provide telecommunications service. While BellSouth points out that the construction

standards and permitting requirements of the Ordinance have added to the amount of time that it takes to get construction projects planned, approved, permitted, constructed, and completed — what BellSouth calls a "delay" — the plain fact of the matter is that BellSouth has not been prohibited from providing service. Section 253(a) speaks in terms of a prohibition, not in terms of minor delays that may be incurred because BellSouth must now submit construction plans and obtain permits before commencing construction work that involves the excavation of the City's streets and rights-of-way. BellSouth's claims against the City are best characterized in its response to the City's motion for summary judgment when it states that because of the burdens imposed by the Mobile Ordinance, "BellSouth's costs of doing business in Mobile have increased materially." However, other than increased costs and occasional inconvenience, BellSouth has been unable to convince the court that there is anything illegal or impermissible in Ordinance 57-022.

After careful consideration, the court finds that there is no genuine issue of material fact, and that the City of Mobile is entitled to the entry of judgment in its favor as a matter of law. Based upon the foregoing, the City of Mobile's motion for summary judgment is due to be and is hereby **GRANTED**. BellSouth's

requests for injunctive and declaratory relief are therefore **DENIED**. The City of

Mobile's Motion to Dismiss (Doc. 40) is **DENIED AS MOOT**.


DONE this _30_ day of March, 2001.

RICHARD W. VOLLMER, JR.
**SENIOR UNITED STATES DISTRICT JUDGE**